IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BILLUPS, INC., an Oregon
corporation,

        Plaintiff,

v.

AMBASSADOR TECHNOLOGIES, INC.
dba BYPROXIE, a foreign
corporation; HOMETOWN HEART,
a foreign corporation; EAZE
TECHNOLOGIES INC., a foreign
corporation; HERBAN
INDUSTRIES, INC., a foreign
corporation; and HERBAN
INDUSTRIES CA LLC, a foreign
limited liability company,

        Defendants.

3:20-cv-00891-BR

OPINION AND ORDER

NICHOLAS M. DRUM
DAYNA JEAN CHRISTIAN
Immix Law Group
600 N.W. Naito Parkway
Suite G
Portland, OR 97209
(503) 802-5547

        Attorneys for Plaintiff

1 - OPINION AND ORDER

**STEVEN C. BERMAN**
**LYDIA ANDERSON-DANA**
Stoll Stoll Berne Lokting & Schlachter
209 S.W. Oak Street
Fifth Floor
Portland, OR 97204
(503) 227-1600

**PAUL LLEWELLYN**
**EVANGELINE ZIMMERMAN BURBIDGE**
**AMY KASHIWABARA**
Lewis & Llewellyn LLP
601 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 800-0590

         Attorneys for Defendants Hometown Hart and Eaze
         Technologies, Inc.

**BROWN, Senior Judge.**

      This matter comes before the Court on the Motion (#49) of
Eaze Technologies, Inc., and Hometown Hart (HTH) to Dismiss the
Second Amended Complaint and the Motion of Eaze and HTH (#58) to
Strike Portions of the Declaration of Edward Fields in Support of
Plaintiff's Response to Defendants' Motion to Dismiss Second
Amended Complaint.  The Court concludes the record is
sufficiently developed, and, therefore, oral argument would not
be helpful to resolve these Motions.  For the reasons that
follow, the Court **GRANTS** Defendants' Motions.


                        <u>BACKGROUND</u>

      The following facts are taken from Plaintiff's Second

2 - OPINION AND ORDER

Amended Complaint (SAC) and the parties' filings related to the Motions to Strike and to Dismiss of Eaze and HTH and are taken as true unless otherwise noted.

Plaintiff Billups, Inc., is an Oregon corporation "that specializes in the placement of certain Out of Home (OOH) and other media advertising for . . . companies and advertising agencies." SAC at ¶ 1.

Defendant Ambassador Technologies, Inc. dba ByProxie (ByProxie)[1] is an advertising agency registered in Delaware and has its principal place of business in California. ByProxie is not registered with the Oregon Secretary of State to conduct business in Oregon.

DionyMed Brands, Inc.,[2] was a Canadian corporation that owned 100% of Defendant Herban Industries, Inc., a Delaware corporation. Herban Industries, Inc.,[3] in turn, owned at least seven subsidiaries including Defendant Herban Industries CA LLC,[4]

_____

[1] On January 5, 2021, the Court entered an order of default against ByProxie pursuant to Federal Rule of Civil Procedure 55(a) for failure to appear.

[2] DionyMed is not a party to this action. "On October 29, 2019, [it] was placed into receivership by the Supreme Court of British Columbia in Bankruptcy and Insolvency." SAC at ¶ 3.

[3] On May 14, 2021, the Court entered an order of default against Herban Industries, Inc., pursuant to Federal Rule of Civil Procedure 55(a) for failure to appear.

[4] On December 9, 2020, the Court entered an order of default against Herban Industries CA LLC pursuant to Federal Rule of Civil Procedure 55(a) for failure to appear.

a limited liability company registered and headquartered in California, and Defendant HTH, a cannabis dispensary registered and headquartered in California.  Decl. of Nicholas Drum, Ex. B at 17.  In February 2020 HTH was purchased by Defendant Eaze, a "Delaware corporation that operates in California."  SAC at ¶ 6.

Plaintiff alleges on December 5, 2018, Herban Industries entered into a "Master Services Agreement (the MSA).  Under the terms of the MSA, HTH granted to Herban absolute control over HTH and its business practices."  SAC at ¶ 5.  The MSA is not in the record.  To support this allegation Plaintiff relies on "a truncated copy of the Affidavit of Yana Kislenko [filed] in the Supreme Court of British Columbia In Bankruptcy and Insolvency, In the Matter of the Receivership of Dionymed Brands Inc" together with Exhibit A, which "is the Annual Information Form of [DionyMed] dated May 31, 2019."  Drum Decl. ¶ 7.  "Ms. Kislenko is the vice president of Glas Americas LLC, which was the collateral agent under a certain credit agreement between [DionyMed] and its creditors."  *Id*.

Plaintiff alleges in 2019 DionyMed,

> acting by and through its subsidiaries Herban
> [Industries], Herban CA, and HTH, operated Chill,
> a direct-to-consumer e-commerce storefront for
> same-day delivery of cannabis in the San Francisco
> Bay Area.  Chill . . . sold cannabis products in
> California using the websites www.calichill.com,
> and later www.orderchill.com, wherein users could
> place orders for cannabis products that were
> manufactured, in whole or in part, by Herban CA,
> and have them . . . delivered by HTH (the Chill

4 - OPINION AND ORDER

Sales).

SAC at ¶ 16.  According to Plaintiff, DionyMed "divided the . . . manufacturing, distribution, sale, and delivery of cannabis in California into different entities that were structured to work seamlessly together in providing one cohesive cannabis service to the public."  SAC at ¶ 17.  Specifically, Herban CA "worked as a manufacturer and distributor of cannabis products but did not have the licensure to sell them.  HTH, conversely, worked as a retailer and deliverer of cannabis but did not have the licensure to manufacture or distribute them."  SAC at ¶ 17.  Plaintiff alleges DionyMed

> structured Herban CA, and HTH under Herban
> [Industries] to ensure that they would work
> cohesively as the consolidated enterprise known as
> Chill . . .  Herban [Industries] . . . owned and
> managed the distribution and/or manufacturing of
> Chill's self-branded cannabis products that was
> accomplished by and through Herban CA, and wholly
> controlled the sale and delivery of Chill's
> cannabis products that was accomplished by and
> through HTH.  Herban [Industries], as the
> controller of both Herban CA and HTH, was fully
> authorized to make decisions for Chill relating to
> branding and marketing for each company and,
> ultimately, to promote Chill.

SAC at ¶ 18.

On May 1, 2019, Ambassador/ByProxie entered into a Consulting Services Agreement (CSA) with Herban Industries in which Herban Industries "engage[d]" ByProxie

> to perform marketing consulting services.
> [ByProxie] agree[d] to provide Herban
> [Industries], its parents, subsidiaries, and

> affiliates with those materials and Deliverables
> (as later defined) requested by Herban
> [Industries], and all services reasonably
> necessary to perform its obligations under this
> Agreement (collectively, the "Services"),
> specifically with the aim of acquiring 10,000 new
> customers each month for Herban [Industries']
> products and services.

Decl. of Edward Fields, Ex. A at ¶ 1.1.  Plaintiff alleges "HTH
fully authorized and consented to the terms of the CSA at the
time that [Plaintiff] and ByProxie entered into the CSA."  SAC at
¶ 24.  HTH and Eaze dispute this allegation.

On April 25, May 1, May 20, June 25, June 26, and
September 17, 2019, ByProxie and Plaintiff entered into Media
Authorizations pursuant to the CSA in which ByProxie authorized
Plaintiff "to act as [ByProxie's] agent in placing out of home
[OOH] advertising with owners and other applicable parties,
entering into contracts and schedules for placement of OOH on
behalf of [ByProxie], and directing the production and
installation of advertising media."  First Amended Complaint
(FAC) Exs. A at 8, B at 3, C at 7, D at 8, E at 9, F at 4.  The
Authorizations indicate:  "The parties acknowledge that
[ByProxie] may be acting as agent to an advertising customer
(Advertiser), and that if so, Advertiser shall guarantee
[ByProxie's] payment of all charges, expenses and costs arising
out of all contracts and/or schedules with OOH owners."  FAC Exs.
A at 8, B at 3, C at 7, D at 8, E at 9, F at 4.

Plaintiff alleges it fully performed under all of the

6 - OPINION AND ORDER

Authorizations, but ByProxie paid only part of the funds due under the April 25, May 1, and May 20, 2019, Authorizations and did not pay any of the funds due under the June 25, June 26, and September 17, 2019, Authorizations.

As noted, in February 2020 Eaze purchased HTH.

On June 3, 2020, Plaintiff filed a Complaint in this Court in which it brought claims for breach of contract and unjust enrichment against ByProxie, HTH, and Eaze.

On September 18, 2020, Plaintiff filed a First Amended Complaint in which it added Herban CA as a defendant and attached the six Media Authorizations.

On October 19, 2020, HTH and Eaze filed a Motion to Dismiss the claims against them in Plaintiff's First Amended Complaint on the ground that this Court lacks personal jurisdiction over HTH and Eaze.

On December 9, 2020, the Court entered an Order of Default as to Herban CA.

On January 5, 2021, the Court entered an Order of Default as to ByProxie.

On February 26, 2021, the Court issued an Opinion and Order in which it granted HTH and Eaze's Motion to Dismiss the claims against them in Plaintiff's First Amended Complaint.  The Court, however, granted Plaintiff leave to file a Second Amended Complaint to amend its agency assertions consistent with the

Opinion and Order if Plaintiff was able to do so.

On March 25, 2021, Plaintiff filed a Second Amended Complaint[5] in which it added Herban Industries, Inc., as a defendant and included allegations in further support of its agency assertions.

On April 22, 2021, HTH and Eaze filed a Motion to Dismiss the Second Amended Complaint for lack of jurisdiction.

On May 14, 2021, the Court entered an Order of Default as to Herban Industries.

On May 20, 2021, HTH and Eaze filed a Motion to Strike Portions of the Declaration of Edward Fields in Support of Plaintiff's Response to Defendants' Motion to Dismiss Second Amended Complaint.

The Court took both Motions under advisement on June 10, 2021.

## MOTION (#58) TO STRIKE

HTH and Eaze move to strike paragraphs 12 through 16 of the Declaration of Edward Fields (#54) in Support of Plaintiff's Response to Defendants' Motion to Dismiss Second Amended Complaint pursuant to Federal Rule of Evidence 602.  Plaintiff opposes the Motion on the ground that Rule 602 does not apply in

---

[5] It does not appear on this record that Plaintiff served any defendant other than Herban Industries, Inc., with the Second Amended Complaint.

the context of motions to dismiss.

## I.   Standard

The Rules of Evidence "apply to proceedings in United States courts" subject to certain exceptions not applicable here.  Fed. R. Evid. 101; Fed. R. Evid. 1101.  The Ninth Circuit has made clear that when ruling on a motion for summary judgment, "a trial court can only consider admissible evidence."  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  Although the underlying Motion at issue here is one to dismiss for lack of jurisdiction, "[p]ersonal knowledge is just as important in conducting the rigorous analysis required" to determine whether this Court has jurisdiction "as is personal knowledge in deciding a summary judgment motion."  *Soutter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 131 (E.D. Va. 2014).  In addition, the "Federal Rules of Evidence teach that personal knowledge is the predicate of reliability."  *Id*.  The Court, therefore, concludes Rule 602 applies to testimony included in a declaration submitted in support of a motion to dismiss for lack of jurisdiction.

Rule 602 provides:  "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  A declarant "must do more than assert a fact as true to show that he possesses personal knowledge of that fact."  *Barrowman v. Wright Med. Tech. Inc.*, No. C15-0717JLR, 2017 WL 4161688, at *3 (W.D.

Wash. Sept. 19, 2017)(citation omitted).  *See also Ho v.
Postmaster Gen.*, No. C 09-1600 MEJ, 2010 WL 309037, at *2 (N.D.
Cal. Jan. 25, 2010)(The plaintiff "has not shown that she has
personal knowledge that a copy of Poster 72 dating before
December 2005 could not be found.  Therefore, the Court grants
the Postal Service's motion to strike the evidence in her
declaration regarding that issue under Fed. R. Evid. 602.").

## II.  Discussion

As noted, HTH and Eaze move to strike paragraphs 12 through
16 of Fields's Declaration.  Fields testifies in his Declaration
that he "was the Chief Executive Officer and Chairman of the
Board of Directors for Dionymed Brands, Inc. . . . . from
approximately May of 2017 through December 2019."  Fields Decl.
at ¶ 1.  Fields explains DionyMed was the parent company of
Herban Industries, which, in turn, was the parent company of HTH
and Herban CA.  Fields states

> [i]n Spring of 2019, Herban [Industries] entered
> into a Consulting Services Agreement ('CSA')
> . . . .  Under the CSA, Herban [Industries]
> engaged ByProxie to coordinate an advertising
> campaign with the aim of growing Chill's customer
> base.  Specifically, ByProxie agreed to provide
> marketing services to Herban [Industries], "its
> parents, subsidiaries, and affiliates" which
> included HTH and Herban CA, with certain
> advertising deliverables.

Fields Decl. at ¶ 11.  Fields's testimony is supported by a copy
of the CSA signed by Zoe Fields, "CEO, Founder" of Ambassador
Technologies/ByProxie.  Fields Decl., Ex. A at ¶ 9.

10 - OPINION AND ORDER

In paragraphs 12 through 16 Fields testifies:

12. At the time that Herban [Industries] entered into the CSA, it was contemplated that ByProxie would engage a vendor to provide out-of-home advertisement services for Chill's promotional content. It was agreed that ByProxie would be reimbursed for the costs of this advertising, together with a fee. It was further understood by Herban [Industries], HTH, and Herban CA that ByProxie would be paid out of the revenue of Chill's sales—revenue that would have flowed through HTH as the retailer for Chill.

13. Though HTH's approval of the CSA was not needed, because it had delegated control over its marketing and branding to Herban [Industries], HTH was aware of the CSA and approved of the same.

14. ByProxie, in performing under the CSA, engaged Plaintiff to provide out-of-home advertising services, and signed six contracts from Plaintiff, each entitled "Media Authorizations." Prior to signing these agreements, ByProxie sent them to both Herban [Industries] and HTH for review and approval. Specifically as to HTH, these Media Authorizations were sent to Evan Tenanbaum and/or someone on his team. HTH reviewed and approved of ByProxie signing these Media Authorizations and, otherwise, engaging Plaintiff. Herban [Industries] similarly approved on behalf of itself and as the manager of HTH and owner of Herban CA. HTH, Herban [Industries], and Herban CA all knew and agreed that they were ultimately responsible for the payment of Plaintiff's invoices.

15. Over the course of ByProxie's performance under the CSA, and during the time that ByProxie was dealing with Plaintiff, ByProxie representatives met regularly with representatives from Herban [Industries] and HTH to report on the status of the media campaign and receive direction from Herban [Industries] and HTH. These meetings were no less than once per week. Herban [Industries] exercised control over ByProxie, acting both for itself and as the manager of HTH under the MSA. Though Herban [Industries] had

authority to act on HTH's behalf, practically
speaking, HTH also provided input and direction to
ByProxie concerning its performance under the CSA
and ByProxie's dealings with Plaintiff.  Byproxie
adhered to the direction it received from HTH and
Herban [Industries].  ByProxie also regularly
forwarded to representatives of Herban
[Industries] and HTH the invoices that it received
from Plaintiff, which Herban [Industries] and HTH
regularly reviewed and approved.

16.  Herban [Industries] made it clear to ByProxie
that, in engaging Plaintiff and coordinating a
media campaign for Chill, it was acting on behalf
of Herban [Industries], HTH, and Herban CA and not
on behalf of itself.  Accordingly, ByProxie
deferred to the directions that it received from
Herban [Industries], acting on behalf of HTH and
Herban CA, and the directions it also received
from HTH.

HTH and Eaze point out that Fields testifies only that he

was the former CEO of nonparty Canadian parent corporation

Dionymed whose subsidiary Herban Industries was the parent

company of multiple subsidiaries including HTH and Herban CA.

Fields does not testify nor does the record reflect he was an

officer or member of Herban Industries, HTH, Herban CA, ByProxie,

or Plaintiff or that he was personally involved in decisions made

by or for Herban Industries, HTH, or Herban CA.  Fields also does

not state his Declaration is based on personal knowledge or

provide any testimony that indicates he was personally involved

in decisions and meetings by and between Herban Industries, HTH,

Herban CA, and ByProxie.  For example, Fields's Declaration does

not support an inference that statements such as the following

are based on Fields's personal knowledge:  "ByProxie

representatives met regularly with representatives from Herban
[Industries] and HTH to report on the status of the media
campaign and receive direction from Herban [Industries] and HTH.
These meetings were no less than once per week."  The Ninth
Circuit held under similar circumstances that a district court
did not err when it struck an affidavit for lack of personal
knowledge.  *See Wicker v. Oregon ex rel. Bureau of Labor* 543 F.3d
1168, 1178 (9th Cir. 2008)("These paragraphs described the
negotiations that occurred at the 1978 Board meeting.  The
district court struck the paragraphs because they lacked any
facts demonstrating that the PERS Director or Assistant Director
were actually at that meeting.  The affiants' assertions about a
meeting which they apparently did not attend and about which they
had no personal knowledge are not the proper subject of an
affidavit.  Thus, the district court also did not abuse its
discretion in striking these paragraphs.").  Moreover, here
Plaintiff has not submitted a declaration or testimony from any
officer, executive, or employee of Herban Industries, HTH, Herban
CA, or ByProxie to support Fields's statements in paragraphs 12
through 16 of his Declaration.

To the extent that Plaintiff asserts the Court could infer
Fields had personal knowledge of the facts set out in paragraphs
12 through 16 of his Declaration because Fields would necessarily
have personal knowledge of all events, meetings, and contracts

13 - OPINION AND ORDER

conducted or entered into by the subsidiaries of Herban
Industries, Dionymed's subsidiary, courts have declined to make
that kind of inference under similar circumstances. *See, e.g.,*
*Lynch v. North Am. Co. for Life & Health Ins*., 300 F. Supp. 3d
1158, 1164-65 (D. Idaho 2018)(Although the executive who oversaw
the billing and accounting team could testify regarding general
policies and procedures, the court granted a motion to strike
portions of the executive's affidavit regarding what happened in
a particular instance because the witness did "not possess actual
knowledge" regarding those facts.); *Hagen v. U.S.*, 486 F. Supp.
2d 622, 626 (D. Md. 2007)(statements from a President/COO
regarding what others signed or instructed would not be
considered unless he had personal knowledge); *Texaco Antilles*
*Ltd. v. Creque*, 273 F. Supp. 2d 660, 665 (D.V.I. 2003)(corporate
secretary "was prevented from offering his opinion regarding the
intent of the transaction . . . because he had no personal
knowledge of it"); *Los Angeles Times Comm., LLC v. Dep't of Army*,
442 F. Supp. 2d 880, 886 (C.D. Cal. 2006)(portions of a
declaration would not be considered because it was unclear how
the witness, "in his role as General Counsel, acquired personal
knowledge" of those matters). *Compare EPAC Techs., Inc. v.*
*Harpercollins Christian Publ'g, Inc.*, No. 3:12-CV-00463, 2019 WL
109371, at *9 (M.D. Tenn. Jan. 4, 2019)(finding testimony of the
plaintiff's CEO was sufficiently based on personal knowledge even

though he was not the plaintiff's CEO during the relevant period because he "remained on [the plaintiff's] board[,] . . . attended board meetings (either in person or by phone), and had meetings with other . . . personnel" of the plaintiff).

On this record the Court concludes Plaintiff fails to establish paragraphs 12 through 16 of Fields's Declaration are based on his personal knowledge.  Accordingly, the Court grants the Motion to Strike paragraphs 12 through 16 of Fields's Declaration.

## MOTION (#49) TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

HTH and Eaze move to dismiss Plaintiff's Second Amended Complaint on the ground that this Court lacks personal jurisdiction over them.  Plaintiff contends this Court has specific jurisdiction over HTH and general and/or specific jurisdiction over Eaze.

## I.   Standards

When "the existence of personal jurisdiction is challenged and the defendant appears specially to contest its presence in the jurisdiction, the plaintiff has the burden to come forward with some evidence to establish jurisdiction." *Dist. Council No. 16 of Intern. Union of Painters & Allied Trades, Glaziers, Architectural Metal & Glass Workers, Local 1621 v. B&B Glass, Inc.*, 510 F.3d 851, 855 (9th Cir. 2007)(citing *Schwarzenegger v.*

15 – OPINION AND ORDER

*Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)).  "The court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001)(citing *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).  If the court makes a jurisdictional decision based only on pleadings and affidavits submitted by the parties and does not conduct an evidentiary hearing, the plaintiff need make only a *prima facie* showing of personal jurisdiction.  *B&B Glass*, 510 F.3d at 855 (citation omitted).  When determining whether the plaintiff has met the *prima facie* showing, the court must assume the truth of uncontroverted factual allegations in the complaint.  *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002).  *See also In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019)("When the party invoking jurisdiction does not ask for jurisdictional discovery [,] . . . [the court] must evaluate whether the pleadings and affidavits establish a *prima facie* showing of jurisdictional facts.  Although the party asserting jurisdiction is required only to establish a *prima facie* showing of jurisdictional facts, the standard is not toothless.  The party asserting jurisdiction cannot simply rest on the bare allegations of its complaint; however, uncontroverted allegations in the complaint must be taken as true.")(quotations omitted)).

A court's personal jurisdiction over a particular defendant is proper either as "general" or "specific" personal jurisdiction.  "General jurisdiction exists when the defendant's contacts with the forum state are so 'continuous and systematic' as to render the defendant essentially 'at home' in that forum." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018)(citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014)).

Even if the district court does not have general jurisdiction over the defendant, the court may have specific jurisdiction "if the controversy is sufficiently related to or arose out of the defendants' contacts with the forum."  *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995). *See also Jine v. OTA Franchise Corp.*, No. SACV2000769JVSKESX, 2020 WL 7129374, at *4 (C.D. Cal. Sept. 11, 2020)("A defendant is subject to specific personal jurisdiction only if a controversy arises out of or is sufficiently related to the defendant's contacts with the forum state.").

Specific personal jurisdiction "over a nonresident defendant is tested by a two-part analysis.  First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute.  Second, the exercise of jurisdiction must comport with federal due process."  *Bauman v. DaimlerChrysler Corp.*, 579 F.3d 1088, 1094 (9th Cir. 2009)

(quotations omitted).  "Oregon Rule of Civil Procedure 4(L) extends jurisdiction to the limits of due process under the United States Constitution." *Rubicon Glob. Ventures, Inc. v. Chongquing Zongshen Grp. Imp./Exp. Corp.*, 630 F. App'x 655, 657 (9th Cir. 2015). *See also Pac. Reliant Indus., Inc. v. Amerika Samoa Bank*, 901 F.2d 735, 737 (9th Cir. 1990)("Oregon's long-arm statute confers jurisdiction to the outer limits of due process under the United States Constitution."); *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2800 n.8 (2011)("State long-arm provisions allow the exercise of jurisdiction subject only to a due process limitation in . . . Oregon.").

"The due process analysis, in turn, centers on whether [a nonresident defendant] has 'certain minimum contacts' with [the forum state], such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Fiore v. Walden*, 688 F.3d 558, 573 (9th Cir. 2012) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). *See also Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017)(same).

As noted, a court has specific jurisdiction over a defendant when "the controversy [was] sufficiently related to or arose out of the defendants' contacts with the forum." *Omeluk*, 52 F.3d at 270. The Ninth Circuit applies the following three-part test to determine whether a district court constitutionally may exercise

specific jurisdiction over a nonresident defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Freestream Aircraft*, 905 F.3d at 603 (quoting *Schwarzenegger,* 374 F.3d at 802).  This "minimum contacts test 'ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.'" *Freestream Aircraft*, 905 F.3d at 603 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

"'The plaintiff bears the burden of satisfying the first two prongs of the test.'"  *Axiom Foods, Inc. v. Acerchem Int'l, Inc*., 874 F.3d 1064, 1068-69 (9th Cir. 2017)(quoting *Schwarzenegger*, 374 F.3d at 802).  "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Schwarzenegger*, 374 F.3d at 802.  "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be

reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King*, 471 U.S. at 476-78). *See also Axiom Foods*, 874 F.3d at 1068-69 ("If the plaintiff meets [its] burden, 'the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." (quoting *Burger King*, 471 U.S. at 476-78)).

> To evaluate reasonableness, we use a seven-factor balancing test that weighs: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Freestream Aircraft*, 905 F.3d at 607 (quotation omitted).

## II.  Specific Jurisdiction over HTH and Eaze

HTH and Eaze move to dismiss the claims against them in Plaintiff's Second Amended Complaint on the ground that Plaintiff has not made a sufficient *prima facie* showing that this Court has specific jurisdiction over HTH and Eaze.  Plaintiff, in turn, asserts it has alleged sufficient facts to establish that this Court has specific jurisdiction over HTH and Eaze.

As noted, for purposes of determining whether a court has specific jurisdiction over a defendant, the court must consider the factors set out in *Freestream Aircraft*.  When a plaintiff "fails to satisfy [any] of [the] prongs, personal jurisdiction is

20 - OPINION AND ORDER

not established in the forum state." *Schwarzenegger*, 374 F.3d at 802.

### A.   Purposeful Availment

"[A] purposeful availment analysis is most often used in suits sounding in contract." *Freestream Aircraft*, 905 F.3d at 605. "A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.  See also Burger King*, 471 U.S. at 475-76 (A court has specific jurisdiction over a defendant when "he deliberately engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum.").

It is undisputed that HTH and Eaze are not Oregon corporations, are not registered to do business in Oregon, and have not done business in Oregon.  As noted, HTH is a California dispensary registered and headquartered in California, and Eaze is a Delaware corporation that does business in California.

Plaintiff concedes HTH and Eaze have not had direct contact with Oregon.  Plaintiff, however, asserts it has alleged sufficient facts to establish that HTH purposefully availed itself of the privilege of conducting business in Oregon. Specifically, Plaintiff alleges ByProxie "reached out and obtained Plaintiff's services" and when it did so, it was acting

as an agent of HTH.   Thus, Plaintiff asserts this Court has specific jurisdiction over Eaze as "the successor of HTH."  Pl.'s Resp. at 26.

In *Williams v. Yamaha Motor Company*, 851 F.3d 1015 (9th Cir. 2017), the Ninth Circuit reviewed the sufficiency of agency allegations in the context of a challenge to the court's specific jurisdiction after the Supreme Court's decision in *Daimler AG v. Bauman*.  The Ninth Circuit noted in *Williams* that when "*Daimler* voided our agency approach for imputing contacts for the purpose of general jurisdiction[,] it left open the question of whether an agency relationship might justify the exercise of specific jurisdiction."  *Williams*, 851 F.3d at 1023 (citing *Daimler*, 134 S. Ct. at 759 n.13).  Notwithstanding *Daimler*, the Ninth Circuit "assum[ed] . . . some standard of agency continue[d] to be relevant to the existence of specific jurisdiction."  *Id*.  The Ninth Circuit concluded specific jurisdiction may be based on an agent's contacts with the forum state only when the "agent act[s] on the principal's behalf and subject to the principal's control."  *Williams*, 851 F.3d at 1024 (quotations and citations omitted)(emphasis added).  Specifically, the court pointed out that

> [f]undamental tenets of agency theory require that an agent "act on the principal's behalf and subject to the principal's control."  Restatement (Third) Of Agency § 1.01 (2006); *see also Batzel v. Smith*, 333 F.3d 1018, 1035 (9th Cir. 2003) ("Agency requires that the principal maintain

> control over the agent's actions").  Accordingly,
> under any standard for finding an agency
> relationship, the [principal] must have the right
> to substantially control its [agent's] activities.
> *See, e.g., Unocal*, 248 F.3d at 926; *Murphy v.*
> *DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir.
> 2013).

*Williams*, 851 F.3d at 1024-25 (emphasis added).  The Ninth

Circuit noted the appellants in *Williams* "neither allege[d] nor

otherwise show[ed] that [the alleged principal] had the right to

control [the alleged agent's] activities in any manner at all."

*Id.* at 1025.  The Ninth Circuit stated:

> Appellants do allege that "Defendants . . . were
> the agents or employees of each other and were
> acting at all times within the course and scope of
> such agency and employment . . . and are legally
> responsible because of their relationship with
> their co-Defendants."  This is, however, a
> conclusory legal statement unsupported by any
> factual assertion regarding YMC's control over
> YMUS (or regarding any other aspect of the
> parent-subsidiary relationship), and we
> accordingly do not credit it.

*Id.* at 1025 n.5 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)).  The Ninth Circuit concluded:  "[E]ven assuming the

validity of some formulation of agency analysis such that a

subsidiary's contacts could be attributed to its parent,

Appellants failed to establish specific jurisdiction over YMC."

*Id*. at 1025.

In *Juniper Networks, Incorporated v. Andrade* the

district court discussed the effect of the Ninth Circuit's

decision in *Williams* on the specific-jurisdiction analysis in the

23 - OPINION AND ORDER

context of an alleged agency relationship.  In *Juniper* the
plaintiff entered into a contract with a corporation (HTBase) and
several of its shareholders including HTBase's founder and Chief
Executive Officer, Bruno Andrade.  No. 20-CV-02360-BLF, 2020 WL
5630023, at *1 (N.D. Cal. Sept. 21, 2020).  Eventually the
plaintiff brought an action for breach of contract against five
of the shareholders, including Andrade, based on alleged
misrepresentations by Andrade.  Four of the defendants (foreign
defendants) moved to dismiss the plaintiff's claim against them
on the ground of lack of personal jurisdiction.  Specifically,
the foreign defendants asserted the court did not have general
jurisdiction over them because they

> do not own property or bank accounts in
> California, do not pay taxes in California, are
> not licensed or registered to do business in
> California, have no employees in California, do
> not travel to California for business, and do not
> have regular contacts with California or
> California residents as part of their normal
> business operations.

*Id.*, at *3.  The foreign defendants also asserted the court did
not have specific jurisdiction over them because "they did not
have communications or other dealings directly with [the
plaintiff] or any of its representatives in the United States in
connection with the HTBase acquisition, and . . . they executed
the [contract] in Canada . . . and Brazil."  *Id.*, at *4.  The
plaintiff conceded the court did not have general jurisdiction
over the foreign defendants, but asserted the court had specific

24 - OPINION AND ORDER

jurisdiction because the foreign defendants "purposefully availed themselves of the privilege of doing business in California through Andrade, asserting that Andrade acted as the Foreign Defendants' agent both before and after execution of the [contract]." *Id.* "Under [its] agency theory, [the plaintiff] contend[ed] . . . Andrade's contacts with California may be imputed to the Foreign Defendants." *Id*. The court noted it was "not persuaded that the [contract's] designation of Andrade as the Vendors' Representative satisfies the *Williams* requirements for agency" when the plaintiff pled only that

> Defendants, and each of them, were partners, joint venturers, agents, employees, alter egos, and/or representatives of each other in doing the things herein alleged and, in doing so, were acting within the scope of their respective authorities as agents, employees, and representatives, and are jointly and severally liable to [the plaintiff] . . . [and] [t]his Court also has jurisdiction over all Defendants because, upon information and belief, they engaged in intentional conduct, either directly or through agents, directed at [the plaintiff] that caused harm to [the plaintiff] in California.

*Id.*, at *5. The court noted although "the [contract] certainly establishes . . . Andrade acted on the Vendors' behalf in his role as Vendors' Representative, it does not establish that Andrade was subject to the Vendors' control." *Id.*, at *6. The court concluded "[a]bsent some evidence that the Vendors . . . exercise[d] control over the manner in which Andrade fulfilled his obligations as Vendors' Representative, . . . [the

plaintiff] has not demonstrated . . . Andrade's contacts with California may be imputed to the Foreign Defendants." *Id*. The court, therefore, concluded the plaintiff "failed to meet its burden of showing that the Foreign Defendants purposefully availed themselves of the privilege of doing business in" the forum state. *Id*.

Here Plaintiff asserts a number of allegations in its Second Amended Complaint are sufficient to establish that Herban Industries was acting as HTH's agent when it entered into the CSA with ByProxie and that ByProxie was acting as HTH's agent when ByProxie entered into the Media Authorizations with Plaintiff. Plaintiff, however, does not allege specific facts to support those allegations. For example, Plaintiff alleges HTH "knew and consented to ByProxie signing certain contracts with Plaintiff." SAC at ¶ 11. Plaintiff further alleges "[a]cting on behalf of HTH and Herban CA, Herban [Industries] entered into a [CSA] with ByProxie for the promotion of Chill" and "HTH fully authorized and consented to the terms of the CSA at the time that Herban [Industries] and ByProxie entered into the CSA." SAC at ¶¶ 22, 24. Plaintiff, however, does not allege any specific facts to support those allegations such as who at HTH consented to ByProxie signing contracts on behalf of HTH or how HTH knew someone signed the contracts on behalf of HTH. In addition, David Adams testifies in his Declaration that HTH "has never

entered into any contract with Billups," "HTH did not enter into any agreement with . . . ByProxie," and "HTH was not a party to any agreement between Herban [Industries] and ByProxie, including any agreement to advertise the Chill website."  Adams Decl. at ¶¶ 8-9, 11.

Moreover, Plaintiff's allegations do not support an inference that Herban Industries was subject to HTH's control when it entered into the CSA with ByProxie.  In fact, Plaintiff alleges the opposite in its Second Amended Complaint:  "[U]nder the terms of the MSA, HTH granted to Herban [Industries] absolute control over HTH and its business practices."  SAC at ¶ 5.  In addition, Plaintiff does not allege specific facts to support its assertion that ByProxie was subject to HTH's control.  Plaintiff alleges HTH "authorized and consented to" the terms of the CSA, but Plaintiff does not point to any provision of the CSA that indicates an entity other than Herban Industries had any ability or right to control ByProxie's actions or was bound by or liable under the CSA.  For example, the CSA indicates Herban Industries had the right to control certain aspects of ByProxie's media strategy.  Specifically, the CSA provides:  "All purchases of media, including but not limited to billboard, digital, local Out-Of-Home, field marketing, promotional merchandise, production costs, and engagement of talent will be subject to Herban [Industries's] prior approval.  Herban [Industries] reserves the

right to cancel any such authorization, whereupon [ByProxie] will
take all appropriate steps to effect such cancellation."  Fields
Decl., Ex. A at ¶ 1.2.3.  The CSA required ByProxie to provide
Herban Industries with a monthly report and Herban Industries to
pay "undisputed invoiced amounts within fifteen days" as well as
to "indemnify and hold [ByProxie] harmless with respect to any
claims or actions by third parties against" ByProxie under
certain circumstances.  Fields Decl., Ex. A at ¶¶ 1.2.5, 1.4.

The CSA does not indicate any entity other than Herban
Industries had the right to take any action under the CSA.  In
addition, there is not any evidence in this record that HTH had
the ability to control Herban Industries or ByProxie with respect
to Herban Industries' agreements with ByProxie or in any other
matter.  The Court, therefore, concludes Plaintiff's unsupported
allegations that Herban Industries or ByProxie acted as HTH's
agent are insufficient to establish purposeful availment by HTH
because Plaintiff has not pled facts from which the Court could
find HTH could be liable to Plaintiff as an agent of Herban
Industries or ByProxie.  *See Drury v. Assisted Living Concepts,
Inc.*, 245 Or. App. 217, 224 (2011)("[E]ven when, unlike here, a
third party is the subject of a contract and explicitly benefits
from it, there must still be a manifested assent to be bound by
the agreement because to hold otherwise is to allow contracting
parties to alter the rights of a third party . . . without regard

for whether the third party deems that consideration to be an adequate exchange for the contractual obligations.")(quotations omitted)).

**B.   Arising Out Of or Relating to Defendants' Forum-Related Activities**

"Under the second prong of [the specific] jurisdiction analysis, the plaintiff's claim must be one which arises out of or relates to the defendant's forum-related activities." *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).  When "determining whether [a plaintiff's] claims arise out of [a defendant's] forum-related conduct, the Ninth Circuit follows the 'but for' test." *Id*. (citation omitted).  Thus, Plaintiff here "must show [it] would not have suffered an injury 'but for'" the forum-related conduct of HTH and Eaze. *Id.*  As noted, Plaintiff does not identify any activity of HTH or Eaze in Oregon that gave rise to Plaintiff's alleged injury.

Accordingly, the Court concludes on this record that Plaintiff's claims against HTH and Eaze do not arise out of nor are they related to any activity between Plaintiff and HTH or Eaze in Oregon.

**C.   Fair Play and Substantial Justice**

Because the Court concludes Plaintiff has not met its burden as to either of the first two factors required to establish specific jurisdiction over HTH, the Court need not address the third factor. *See, e.g., Schwarzenegger*, 374

29 - OPINION AND ORDER

F.3d at 802 ("If the plaintiff fails to satisfy either of the[] [first two] prongs, personal jurisdiction is not established in the forum state.").

As noted, Plaintiff bases its assertion that this Court has specific jurisdiction over Eaze because Eaze is HTH's successor. Because the Court has concluded Plaintiff has not established this Court has specific jurisdiction over HTH, the Court also concludes Plaintiff has not established this Court has specific jurisdiction over Eaze.

**III. General Jurisdiction Over Eaze**

Plaintiff asserts in its Response to the Motion to Dismiss that this Court also has general jurisdiction over Eaze.

As noted, "[g]eneral jurisdiction exists when the defendant's contacts with the forum state are so 'continuous and systematic' as to render the defendant essentially 'at home' in that forum." *Freestream Aircraft*, 905 F.3d at 602 (citing *Daimler*, 134 S. Ct. at 761).

In its Second Amended Complaint Plaintiff alleges only that this Court's personal jurisdiction over Eaze "exists as a result of both Eaze's purchase of the assets of Herban and the Herban Entities on January 3, 2020, and its ownership of HTH. Therefore, Eaze is the successor in interest to HTH." SAC at ¶ 13. In its Second Amended Complaint Plaintiff does not allege Eaze sold cannabis in Oregon nor any facts related to such an

30 - OPINION AND ORDER

allegation.  Nevertheless, in it Response to the Motion to
Dismiss Plaintiff alleges this Court has general jurisdiction
over Eaze because even though Eaze did not purchase HTH until
January 2020,

> [i]n 2019 . . . Eaze was operating as a cannabis
> delivery service in Oregon. . . .  The operative
> time period of this action is from May – December
> 2019. . . .  During this exact same time, Eaze
> operated as a cannabis delivery business in
> Oregon.  Eaze's March 6, 2019 press release
> announced that it was now delivering "the best
> Oregon-grown cannabis to Portland."  While Eaze
> has apparently ceased its Oregon operations, it
> was pervasively delivering cannabis in Portland
> during the operative time in this complaint.  As
> such, Eaze's systematic and continuous contacts
> with Oregon in 2019 are adequate grounds for this
> Court to assert general jurisdiction over it in
> this action.

Pl.'s Resp. at 26-27.  Plaintiff relies on a March 6, 2019, press
release by Eaze to support its statement.  The press release
states:

> Eaze, a leading cannabis software platform and
> marketplace, today announced that its on-demand
> delivery platform is now available in Portland,
> marking its first expansion outside California.
> Oregon-based dispensary Kaleafa is partnering with
> Eaze to provide safe, legal access to cannabis for
> adults.
>
> * * *
>
> Eaze's expansion to Oregon continues a period of
> significant growth for the company, which launched
> Eaze Wellness CBD delivery to 41 states and the
> District of Columbia in November 2018 and closed a
> $65M Series C round of financing the following
> month, bringing total funding to-date to $117M. In
> January 2019, Eaze announced that first-time
> cannabis consumers on the platform grew by 140%

31 - OPINION AND ORDER

over the previous calendar year in its 2018 "State
of Cannabis" report.

Drum Decl., Ex. A at 1-2.

HTH and Eaze assert in their Reply that "[e]ven if Eaze had
some limited contact with Oregon in the past, there is no
evidence from which the Court could determine whether Eaze's
contacts were sufficiently substantial, continuous, and
systematic enough to subject it to jurisdiction in Oregon on a
lawsuit unrelated to those contacts."  Reply at 5 n.3.

The Supreme Court made clear in *Daimler* that the general
jurisdiction "inquiry . . . is not whether a foreign
corporation's in-forum contacts can be said to be in some sense
'continuous and systematic,' it is whether that corporation's
'affiliations with the State are so continuous and systematic as
to render [it] essentially at home in the forum State.'"
*Daimler*, 571 U.S. at 139 (quoting *Goodyear Dunlop Tires*
*Operations, S.A. v. Brown*, 564 U.S. 915, 920 (2011)).  Moreover,
"[a] corporation that operates in many places can scarcely be
deemed at home in all of them."  *Daimler*, 134 S. Ct. at 762 n.20.
In particular, courts have made clear that affiliations with a
forum state that are not sufficiently continuous and systematic
"as to render it essentially at home" include circumstances such
as "mere purchases [made in the forum State], even if occurring
at regular intervals," *Goodyear*, 564 U.S. at 929, and a
multinational nonforum bank that has a branch in the forum state.

32 - OPINION AND ORDER

*AM Tr. v. UBS AG*, 681 F. App'x 587, 588 (9th Cir. 2017).  *See also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) (concluding the court did not have general jurisdiction over defendant Nike European Operations Netherlands (NEON) even though there were "20 to 27 NEON employees working in Oregon on expatriate assignments [to Nike] at any one time between 2006 and 2008," NEON employees averaged "47 trips per month to Oregon" to conduct business meetings between 2006 and 2011, and NEON entered "into contracts whereby Nike in Oregon [wa]s to act as NEON's agent" because "[i]n contrast with NEON's extensive contacts in Europe, where the vast majority of its employees and business activities are located, the company's limited activities in Oregon do not render it essentially at home there.").

Plaintiff does not allege and the record does not reflect Eaze is incorporated in or has its principal place of business in Oregon.  Accordingly, Eaze does not have the "paradigmatic . . . bases for general jurisdiction" (*i.e.*, the "place of incorporation and/or principal place of business").  *See Daimler*, 571 U.S. at 760.  In addition, the record does not reflect the level of contact that Eaze had with Oregon in 2019.  The March 6, 2019, press release on which Plaintiff relies to support its assertion of general jurisdiction does not specify Eaze's volume of sales, profits, or activity in Oregon nor does it include information from which the Court could infer Eaze's affiliations

with Oregon during the relevant period were "so continuous and systematic as to render [it] essentially at home in" Oregon.  In addition, Plaintiff does not include any factual allegations in its Second Amended Complaint related to sales of cannabis in Oregon by Eaze.  The Court, therefore, concludes on this record that Plaintiff has not established this Court has general jurisdiction over Eaze.

Accordingly, the Court grants the Motion to Dismiss of HTH and Eaze for lack of personal jurisdiction.


## CONCLUSION

For these reasons, the Court **GRANTS** the Motion (#49) of Eaze Technologies and HTH to Dismiss Plaintiff's Second Amended Complaint, **GRANTS** the Motion of Eaze Technologies and HTH (#58) to Strike Portions of the Declaration of Edward Fields in Support of Plaintiff's Response to Defendants' Motion to Dismiss Second Amended Complaint, and, because of its lack of jurisdiction over Eaze and HTH the Court **DISMISSES without prejudice** Plaintiff's Second Amended Complaint as to HTH and Eaze.

IT IS SO ORDERED.

DATED this 13th day of July, 2021.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge


34 - OPINION AND ORDER